[Cite as *CyrusOne, L.L.C. v. Great Am. Ins. Co.*, 2021-Ohio-1971.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| CYRUSONE, LLC, | : | APPEAL NOS. C-200156 |
| | | C-200162 |
| and | : | TRIAL NO. A-1504669 |
| | | |
| CINCINNATI BELL, INC., | : | *O P I N I O N.* |
| | | |
| Plaintiffs-Appellees/Cross-Appellants, | : | |
| | : | |
| vs. | | |
| | : | |
| GREAT AMERICAN INSURANCE COMPANY, | : | |
| | | |
| Defendant-Appellant/Cross-Appellee. | : | |
| | : | |

Civil Appeals From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 11, 2021

*Baker & Hostetler LLP, Ted T. Martin, Robert T. Razzano* and *Carrie Dettmer Sly,* for Plaintiffs-Appellees/Cross-Appellants,

*Eckert Seamans Cherin & Mellott, LLC, F. Joseph Nealon, Michael A. Graziano, Keating Muething & Klekamp PLL* and *Rachael A. Rowe,* for Defendant-Appellant/Cross-Appellee.

**BOCK, Judge.**

{¶1}   These appeals arise from an insurance-claim dispute under a crime-and-fidelity policy ("the policy") issued by defendant-appellant/cross-appellee Great American Insurance Company to plaintiffs-appellees/cross-appellants Cincinnati Bell, Inc., and CyrusOne, LLC, (collectively, "CyrusOne"). The policy insures against losses caused by the acts of a "dishonest employee."

{¶2}   CyrusOne submitted a claim under the policy reporting that its employee, Dennis Scheib, had engaged in an elaborate self-dealing scheme in which he received "kickbacks" from CyrusOne's vendors and directly or indirectly passed the costs of the kickbacks to CyrusOne.

{¶3}   After Great American failed to cover the claim, CyrusOne sued, seeking a declaratory judgment that CyrusOne's claim was a covered loss under the policy and alleging bad faith and breach of contract. CyrusOne alleged that its loss stemmed from Scheib, acting as CyrusOne's purchasing agent, accepting kickbacks from vendors in exchange for awarding them construction work and having a financial interest in several of the vendors to whom Scheib awarded work.

{¶4}   The trial court entered judgment in favor of CyrusOne and awarded it $4,654,560 in damages. Both parties appeal from this judgment.

{¶5}   For the following reasons, we affirm the trial court's judgment.

### The Insurance Policy

{¶6}   Cincinnati Bell, Inc., CyrusOne's former parent company, purchased a crime-protection policy from Great American, which covered losses discovered during the calendar year 2011. CyrusOne was an insured entity under the agreement. The policy, subject to a $1,000,000 deductible, covered:

      I.   Employee dishonesty

We will pay for loss of, and loss from damage to, money, securities and other property resulting directly from dishonest acts committed by an employee, whether identified or not, acting alone or in collusion with other persons, with the manifest intent to:

a. Cause you to sustain loss, and also

b. Obtain financial benefit (other than employee benefits earned in the normal course of employment, including salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions) for:

1. The employee; or

2. any person or organization intended by the employee to receive that benefit.

{¶7} The policy required insureds to bring legal action against Great American within "two years from the date you discover the loss." The policy defined discovery of a loss as "when you first become aware of facts which would cause a reasonable person to assume that a loss covered by this insurance has been or will be incurred, even though the exact amount or details of loss may not then be known."

{¶8} An endorsement to the policy provided that Great American shall pay "the insured for 50% of the claims expense of the insured on any paid claim up to the limit of $100,000."

### Scheib's Self-Dealing Scheme

{¶9} CyrusOne builds and operates datacenters, which are structures that house electrical components to provide power to computer servers that are then

leased or sold to customers. After learning of his scheme, CyrusOne sued Scheib for breach of fiduciary duty. An arbitration panel, applying Texas law, described the details of Scheib's scheme and determined that Scheib had defrauded CyrusOne.

{¶10} Scheib's scheme began shortly after CyrusOne hired him in August 2008 as its director of new construction. Over the next three years, Scheib managed approximately 21 construction projects. He was responsible for developing a budget for each project. He ordered the necessary power equipment and air conditioning units from vendors. Scheib obtained bids from subcontractors for engineering, electrical, and commissioning work necessary to complete the construction and to make the datacenters operational.

{¶11} Scheib instructed the vendors and subcontractors (collectively, "the vendors") to only communicate with him regarding the construction work—he was to be their sole contact at CyrusOne as he was responsible for approving invoices from vendors.

**The Vendors**

{¶12} During Scheib's employment, CyrusOne instituted a preferred-vendor program in which Scheib recommended preferred vendors. CyrusOne could approve or deny his recommendation. Scheib recommended, and CyrusOne approved, Cabo Electric, Inc., as a preferred vendor. Jim Stark, one of Cabo Electric's owners, testified in his deposition that his company could not compete with another electric vendor, FSG, whose bids were consistently lower.

{¶13} Cabo Electric was incorporated in January 2009 by Tim Preski and Stark, friends of Scheib's. Notably, in that same month, Scheib incorporated his own company, Cabo Tech. According to Scheib, Cabo Tech received an almost 40 percent interest in Cabo Electric in exchange for it giving $250,000 to "seed" Cabo Electric.

4

Eventually, half of the seed money was returned to Scheib, but he still received 40 percent of Cabo Electric's profits.

{¶14} Between 2009 and 2011, Scheib awarded Cabo Electric more than $19 million of work on CyrusOne projects. Cabo Electric (as well as Tek Energy, LLC, a part owner of Cabo Electric) transferred more than $1,500,000 to Scheib and/or his businesses. Stark testified that although Cabo Electric was making significant payments to Scheib, he was confident that his company's bids would be profitable and that it would not have to dip into any of Scheib's seed money.

{¶15} K2 Construction ("K2"), a general contractor, was another CyrusOne vendor. In 2009, K2 presented an initial bid for a CyrusOne project—this bid included a line item for $170,000 in commissioning. (Commissioning is a quality-control review to ensure that the equipment installed in the datacenter is performing at design specifications.) But in its final bid, although the total bid amount stayed the same, the line item for commissioning had been removed. Other line item amounts had been increased by a total of $170,000. Despite the commissioning line item disappearing, Scheib's company, Datacenter Management Services ("DMS"), invoiced K2—and K2 paid—$170,000 for purportedly completing commissioning work. K2's owner testified that any money he spent on a CyrusOne project, he recouped it by submitting an invoice to CyrusOne for that amount.

{¶16} Jim McDowell owned Critical Infrastructure Solutions ("CIS"). CIS was a preferred vendor of CyrusOne. Most of CIS's equipment sales were to CyrusOne. Because of that, McDowell reported that when Scheib asked him to cover the cost of a Mediterranean cruise for Scheib and his wife, CIS did so.

{¶17} McDowell recalled that although he was hesitant, he gave Scheib's company, Cabo Tech, a 25 percent interest in CIS in exchange for "collateral," which

McDowell said he had not needed for his business. McDowell testified that he only entered into this arrangement because he did not want to upset Scheib, who directed CyrusOne's construction business. During the course of Scheib's employment with CyrusOne, CIS gave Scheib and his companies more than $300,000.

{¶18} Critical Mission Corporation, a.k.a. Contract Management Corporation ("CMC"), a company owned by Tim Preski (Scheib's friend), was also a preferred vendor during Scheib's employment. CMC performed commissioning work for CyrusOne projects. CyrusOne paid CMC more than $ 1,000,000 for commissioning work during Scheib's employment. During this same time, CMC paid Scheib $99,000. Scheib claimed that this payment was compensation for writing test scripts for commissioning. But Scheib could not produce documentation (other than his invoice) that he or DMS had actually performed that work for CMC.

{¶19} Over the course of his employment at CyrusOne, Scheib and his companies, Cabo Tech and DMS, received approximately $5.6 million from CyrusOne vendors. Although Scheib contended that some of this money was for work on projects unrelated to CyrusOne, he could not produce business records to support his contention.

## CyrusOne's Discovery of Loss

{¶20} In the fall of 2010, CyrusOne's president, Dave Ferdman, became suspicious about Scheib's activities as director of construction when he learned that Scheib had invested a substantial sum of money, inconsistent with his salary, in a real estate venture. CyrusOne hired Premier Protection Group ("Premier") to investigate Scheib to determine if he was engaged in self-dealing or using his employment with CyrusOne to enrich himself. CyrusOne permitted Premier to place a recording device in Scheib's office to secretly record his conversations.

{¶21} Sharon White Ellis, a CyrusOne human-resources employee, testified that she had listened to the recordings. She recalled that the conversations were difficult to understand and that she had heard nothing to demonstrate that Scheib had been acting improperly. She testified that she believed that she gave the tapes to her replacement when she left the company. CyrusOne could not locate the recordings.

{¶22} In May 2011, Premier reported to CyrusOne that Scheib's repeatedly awarding work to Cabo Electric created an appearance of collusion between Scheib and Tim Preski, the owner of Cabo Electric. But Premier noted, "due to the very limited scope of the investigation and without additional investigative processes, this hypothesis cannot be supported."

{¶23} CyrusOne reported Premier's findings to Cincinnati Bell, which then initiated its own investigation into Scheib's activities. Cincinnati Bell retained a law firm and an accounting firm, KPMG, to investigate whether Scheib was receiving kickbacks and/or bribes from vendors.

{¶24} On Cincinnati Bell's law firm's advice, CyrusOne contacted the United States Postal Inspector to inform him that it suspected Scheib potentially was involved in illegal activity in which he used the mail. CyrusOne sought the Inspector's assistance with the investigation to cut down on its time and costs investigating Scheib. The United States Postal Inspector declined to participate.

{¶25} On August 4, 2011, Bryan O'Connell from KPMG sent the following email to Cincinnati Bell's general counsel:

> Here are examples of what we have pulled together
> relating to subcontracting and payments which go back
> to Dennis' business Datacenter Management Services

(DMS). We believe that this may be the principal scheme and we have begun to identify this scenario during his employment with CyrusOne among the documents and data we are analyzing. We are focused on identifying other examples of this currently. Let us know what questions you have.

{¶26} Attached to the email was documentation showing that CMC had paid Scheib for commissioning work that he had performed on a CyrusOne project before he began his employment with CyrusOne. O'Connell testified that at the time that he had sent this email, KPMG had not yet identified any examples of payments from vendors to DMS or Scheib during Scheib's employment with CyrusOne. Further, O'Connell testified that KPMG had not reached a conclusion as to whether Scheib's activities had been detrimental to CyrusOne.

{¶27} On August 24, 2011, CyrusOne terminated Scheib's employment. Following his termination, CyrusOne began interviewing its vendors and other employees and learned the extent of Scheib's scheme.

**The Insurance Claim**

{¶28} CyrusOne notified Great American of its potential claim in September 2011. CyrusOne indicated on its third proof of loss submitted to Great American that CyrusOne had discovered the loss, at the earliest, on August 23, 2011.

{¶29} Tracey Archbold, the adjustor assigned to CyrusOne's claim, testified that although she had initially communicated incorrect information to CyrusOne about coverage under the policy, she accurately communicated what documentation was needed to support a covered loss. Further, she testified that Great American

granted CyrusOne several time extensions to gather and submit information to support the claim.

{¶30} Archbold testified that she remembered receiving an email from Jerry Douglas, the underwriter of the policy, which said in part, "Cannot afford another one this year. Save Me!" But Archbold testified that the comment was not relevant to her investigation of CyrusOne's claim and she ignored it. Douglas testified the comment was "tongue-in-cheek" and not a serious request.

{¶31} At trial, Robert Berens, Cincinnati Bell's risk management consultant, confirmed that Great American had granted CyrusOne several extensions of time to submit evidence demonstrating its loss.

{¶32} Thomas Maloney, the vice-president of Great American's crime division, testified that Great American consistently and repeatedly told CyrusOne that it could demonstrate a covered loss by providing inflated invoices from vendors.

{¶33} John Retinger, Great American's assistant vice-president of claims, testified that in kickback schemes he had investigated (more than ten), the insured's loss was at least the amount of the kickback; otherwise, it would not "make sense."

**Commissioning**

{¶34} Jim Hatem, who replaced Scheib as director of construction at CyrusOne, testified at trial. During Scheib's tenure, Hatem had worked as a general contractor on about 33 percent of CyrusOne's datacenter projects that Scheib had managed. Based on his experience, the trial court declared Hatem an expert on commissioning and datacenter construction.

{¶35} Hatem testified that commissioning must be completed by an independent third party for it to have value. He reiterated no one having a stake in the completion of a project—such as the owner of a datacenter or vendors who

supplied and installed the equipment—should perform commissioning. Thus, Hatem opined that any commissioning work performed by DMS technically had no value because it was performed by an interested party.

{¶36} Hatem testified that commissioning usually takes approximately 20 to 25 people a week to complete. He testified that he had observed Scheib purportedly commission a CyrusOne project in only two days, and therefore, the datacenter could not have been properly commissioned.

{¶37} But McDowell, the owner of CIS, testified in his deposition that he saw five or six CMC employees commission a CyrusOne project and that those employees had worked "crazy-long hours."

**Amount of Loss**

{¶38} At trial, Scott Bayley, a certified fraud examiner and public accountant, testified as CyrusOne's expert. Bayley reported that he had 35 years of experience in forensic accounting, valuation, and economic-damage analysis. Further, he had experience investigating kickback schemes.

{¶39} Bayley, who also provided expert testimony at CyrusOne and Scheib's arbitration, testified that Scheib and his companies had received at least $5,654,560 in kickbacks from vendors while Scheib was employed at CyrusOne. Bayley's flowchart, which detailed the flow of money (and the specific amount) from each vendor to Scheib and his business, was admitted into evidence.

{¶40} Bayley testified that Scheib's kickback scheme directly harmed CyrusOne by inflating the costs of construction above fair value. Bayley explained that under accepted economic theory, a kickback scheme necessarily involves inflating the vendor's price for the good or service above fair value by at least the amount of the kickback or bribe. Therefore, Bayley opined that the $5.6 million

"represents a loss to CyrusOne as a result of purposeful inflation." He defined "purposeful inflation" as "inflating the invoices so that the kickbacks can be paid to [Scheib], and the vendor can still make the profit that they desire to make."

{¶41} In reaching his opinion, Bayley stated that he had relied on Scheib's tax returns, the tax returns of the vendors in which Scheib had maintained a financial interest, bank records (including cancelled checks), construction records, including invoices and electronic mail correspondence, and testimony from other witnesses. For example, he relied on Stark's testimony that to be profitable as a vendor of CyrusOne, Stark had to "include [in the bids] the amounts that they were paying to Mr. Scheib."

{¶42} Bayley also testified that Scheib had received $310,000 worth of gifts from vendors, including a luxury car, a Mediterranean cruise, and construction of a pool house at Scheib's home. He testified that this was a loss to CyrusOne as well.

{¶43} Finally, Bayley testified that from the time he was initially contacted about Scheib's activities in 2013, he had invoiced CyrusOne $202,791.48 for his services.

### Trial Court Judgment

{¶44} Before trial, the trial court granted summary judgment in favor of Great American on CyrusOne's bad-faith claim and in favor of CyrusOne on Great American's affirmative defense that CyrusOne "failed to cooperate" in the investigation of the claim. Further, the trial court accepted the CyrusOne/Scheib arbitration panel's findings about the details of Scheib's scheme and its conclusion that Scheib had defrauded CyrusOne. Finally, the trial court ruled that "to show a covered loss, CyrusOne must demonstrate that it sustained an actual depletion of

funds, and the amount of money Scheib received from his schemes does not provide proof in and of itself that CyrusOne suffered depletion in its assets."

{¶45} After trial on the remaining claims, the trial court found that CyrusOne had suffered a loss of $5,654,560 and, after subtracting the $1 million policy deductible, awarded CyrusOne $4,654,560. The trial court asked CyrusOne to submit a judgment entry for the court's signature. CyrusOne asked the court to increase its award to $5,952,401, which included $5,654,560 from its loss from kickbacks, $1,197,070 paid by CyrusOne to CMC for fictional commissioning, and $100,000 in expenses it incurred investigating the claim. The trial court declined to alter its award and entered judgment awarding CyrusOne $4,654,560.

{¶46} Both parties appealed.

## Great American's Appeal

I. The damage award was supported by competent, credible evidence

{¶47} Great American's first assignment of error asserts that the trial court erred by entering judgment in favor of CyrusOne and awarding it $4,654,560 in damages.

{¶48} The standard of review following a civil bench trial is whether the trial court's judgment is against the manifest weight of the evidence as supported by competent, credible evidence. *Downtime Rebuild, LLC v. Trinity Logistics, Inc.*, 2019-Ohio-1869, 135 N.E.3d 1253, ¶ 12 (1st Dist.), citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517. Under a manifest-weight-of-the-evidence review, "every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *Id.*, citing *Eastley* at ¶ 21.

{¶49} When reviewing a trial court's decision under a manifest-weight-of-the-evidence standard, appellate courts review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trial court "clearly lost its way and created a manifest miscarriage of justice." *Fischoff v. Hamilton*, 1st Dist. Hamilton No. C-120200, 2012-Ohio-4785, ¶ 11.

{¶50} The insurance policy stated that it covered a loss of money caused by the dishonest acts of the insured's employee, regardless of whether the employee acts alone or in collusion with other persons, if those acts cause the insured to sustain a loss and the employee (or some person or entity the employee designates) obtains a financial benefit.

{¶51} Great American maintains that CyrusOne failed to prove it had sustained a loss under the policy because it failed to demonstrate that its vendors had passed along the cost of any kickbacks or bribes to CyrusOne in the form of inflated bids or invoices. We disagree. CyrusOne's expert, a CPA and certified fraud examiner, provided unrebutted testimony that the invoices or bids submitted by vendors to CyrusOne were inflated by at least the amount of the kickbacks and that Scheib had received more than $5,000,000 in kickbacks. Bayley's testimony supports the trial court's determination that CyrusOne sustained a loss under the policy.

{¶52} First, Bayley traced payments from CyrusOne to its vendors and then from the vendors directly to Scheib and his businesses. He testified that Scheib and his companies had received at least $5,654,560 in kickbacks from vendors during his employment with CyrusOne. Scheib's tax statements support this testimony. Scheib admitted in his deposition that he had received millions of dollars from CyrusOne

vendors, but he claimed some of it was for work performed on projects unrelated to CyrusOne construction. Despite making this claim, Scheib could not provide any documentation—work records, time sheets, etc.—that he had performed any work on any project unrelated to CyrusOne. Notably, Bayley testified that after Scheib's employment with CyrusOne ended, so did his receipt of money from CyrusOne vendors.

{¶53} Next, Bayley testified, based on his experience investigating kickback schemes and under accepted economic theory, that a vendor who pays a kickback inflates its bid above fair value by at least the amount of the kickback. (Great American's assistant vice-president of claims agreed with this opinion.) As Bayley explained at trial, if Scheib had been an honest employee, he would have negotiated the price for the goods or services down to the fair-value amount without tacking on the amount of the kickback, which would have saved CyrusOne money. Instead, Scheib was "dishonest" and chose not to negotiate a lower price for CyrusOne. Instead, he kept a kickback for himself, thereby causing CyrusOne to spend more money. After testifying to the amount of kickbacks that Scheib had received, Bayley opined that CyrusOne had suffered a $5.6 million loss due to the "purposeful inflation" of the vendors' invoices and/or bids. This unrebutted testimony competently and credibly connected Scheib's receipt of $5.6 million in kickbacks as equal to—or less as—the financial loss suffered by CyrusOne.

{¶54} Lastly, Great American contends that even if there was competent, credible evidence that CyrusOne had suffered a financial loss, the trial court erred in determining the amount of that loss. Great American argues that the bank statements and checks admitted into evidence to support the loss only amount to $2,418,526.94. But Bayley testified that his opinion was not based solely on bank

14

records, but on Scheib's tax documents as well. His personal and business tax records demonstrate that he received an additional $3,000,000 from vendors during his employment with CyrusOne. This documentary evidence, combined with Scheib's testimony that all money he received during the relevant timeframe came from vendors of CyrusOne (although he maintains that it was for work unrelated to CyrusOne projects), is competent, credible evidence of the amount of CyrusOne's loss.

{¶55} Because competent, credible evidence supports the trial court's conclusion about CyrusOne's amount of loss, Great American's first assignment of error is overruled.

II.     CyrusOne's loss was discovered after August 8, 2011

{¶56} In its second assignment, Great American contends that the court erred when it determined that CyrusOne's claim was not barred by the policy's two-year contractual period of limitations. The parties agree that if CyrusOne had discovered its loss prior to August 8, 2011, then its claim would be barred by the policy's contractual period of limitations.

{¶57} The policy defines "discovery of loss" as "occur[ing] when you first become aware of facts which would cause a reasonable person to assume that a loss covered by this insurance has been or will be incurred even though the exact amount or details of loss may not then be known."

{¶58} Great American, citing *Am. Mut. Share Ins. Corp. v. CUMIS Ins. Soc., Inc.*, 10th Dist. Franklin No. 08AP-576, 2009-Ohio-364, maintains that CyrusOne discovered its loss no later than August 4, 2011, the date that KPMG sent Cincinnati Bell documentation that a CyrusOne vendor had sent DMS a payment for commissioning work and reported that KPMG believed that "this may be the

15

principal scheme" used by Scheib. This argument fails. The payment from the vendor to DMS occurred before Scheib's employment with CyrusOne. Further, O'Connell confirmed that as of August 4, 2011, KPMG had not identified any payments going from vendors to Scheib and his companies during Scheib's employment and confirmed that KPMG had not yet reached a conclusion as to whether any of Scheib's activities were detrimental to CyrusOne.

{¶59} *CUMIS* is distinguishable from this case. At issue in *CUMIS* was when an employer first discovered a loss, thus triggering its duty to notify the insurer. In *CUMIS*, an employee had made questionable financial transactions. *Id.* at ¶ 2. After he was terminated, his employer entered into a supervisory agreement with a credit union and two other entities. *Id.* at ¶ 3. The supervisory agreement did not allege that the employee had committed fraud, but did name concerning facts, such as the employee paying expenses that appeared personal, failing to provide a full accounting of checks he wrote, and making preferential loans to risky investors. *Id.* at ¶ 3-4. The *CUMIS* policy defined when discovery occurs as "when you first become aware of facts which would cause a reasonable person to assume that a loss of a type covered under this Bond has been or will be incurred." *Id.* at 20. The court held that the insured discovered the loss no later than when the parties entered into the supervisory agreement.

{¶60} The employer in *CUMIS* had facts showing that its employee's dishonesty had caused a loss. But here, evidence supports the trial court's conclusion that CyrusOne did not have any facts that showed that Scheib had engaged in self-dealing when he was a CyrusOne employee until after August 8, 2011. While KPMG's email correspondence may have caused CyrusOne to suspect that Scheib may be engaged in improper activity, it did not yet know that Scheib's activities were

16

"dishonest" and detrimental to the company. CyrusOne only gained that knowledge after Scheib was terminated and CyrusOne had started contacting and interviewing its vendors.

{¶61} Under a manifest-weight-of-the-evidence review, the trial court is afforded wide deference. Based upon our review of the record, we conclude that there is competent, credible evidence to support the court's finding that CyrusOne had not discovered its loss before August 8, 2011. The second assignment of error is overruled.

III.    CyrusOne did not prejudice Great American's investigation

{¶62} In its final assignment, Great American argues that the trial court erred by entering summary judgment in favor of CyrusOne on Great American's "failure to cooperate" defense.

{¶63} We review a grant of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Summary judgment is appropriately granted when there are no genuine issues of material fact, the party moving for summary judgment is entitled to judgment as a matter of law, and the evidence, when viewed in favor of the nonmoving party, permits only one reasonable conclusion, which is adverse to that party. *State ex rel. Howard v. Ferreri*, 70 Ohio St.3d 587, 589, 639 N.E.2d 1189 (1994).

{¶64} CyrusOne moved for summary judgment on Great American's defense that CyrusOne had failed to cooperate in the investigation of its claim and that this failure materially prejudiced Great American's investigation. It was undisputed that CyrusOne had permitted Premier to secretly record Scheib's office activity and that these recordings were not turned over to Great American.

{**¶65**} In support of its motion for summary judgment, CyrusOne offered the deposition testimony of Sharon White Ellis, a former human-resources employee. Ellis testified that she had listened to a few of the tapes and that they were difficult to understand. She does not remember what she did with the tapes, but that she may have given them to her replacement when she left the company.

{**¶66**} Great American, although it had the opportunity to depose all the people who were involved with the recording of Scheib's office, did not present any evidence that anything on the recordings was material to its investigation of CyrusOne's claim.

{**¶67**} The only evidence presented to the court was that the tapes had not demonstrated any dishonest activity by Scheib. Moreover, CyrusOne did not terminate Scheib after reviewing these tapes. Instead, it continued his employment for another year. Accordingly, we conclude that reasonable minds could only find that the failure to turn over these recordings did not materially prejudice Great American's investigation of CyrusOne's claim.

{**¶68**} The third assignment of error is overruled.

## CyrusOne's Cross-Appeal

I. <u>Great American acted in good faith in processing the claim</u>

{**¶69**} In its first and second assignments of error, respectively, CyrusOne contends that the trial court erred by granting Great American's motion, and denying its own motion, for summary judgment on its bad-faith claim.

{**¶70**} In its summary-judgment motion, Great American argued that CyrusOne could not demonstrate that Great American had acted in bad faith in processing CyrusOne's claim. In support, Great American points to letters it had sent to CyrusOne setting forth how it could prove a covered loss under the policy—by

18

submitting evidence demonstrating that CyrusOne had overpaid for goods or services or that CyrusOne had paid for work that had not been performed. Further, Great American pointed to the fact that it had granted several extensions to the contractual period of limitations so that CyrusOne would have more time to gather and submit proof of a covered loss.

{¶71} In Ohio, an insurance company has a fiduciary duty to act in good faith toward its insured in carrying out its duties under the contract and fails to exercise good faith when it refuses to pay a claim without "reasonable justification." *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 644 N.E.2d 347 (1994).

{¶72} CyrusOne disagreed with Great American as to what constituted a covered loss under the policy. CyrusOne believed that because the arbitration panel, in its lawsuit against Scheib, had found that Scheib had received more than $5,000,000 in kickbacks from vendors, this in and of itself demonstrated a covered loss under the policy. Therefore, CyrusOne argued that Great American did not have a reasonable justification to deny its claim and instead had an improper financial incentive to do so.

{¶73} In support of that argument, CyrusOne pointed to the "Save Me" email sent from the underwriter to the claims adjuster, the underwriter's letter to CyrusOne inaccurately explaining a loss provision in the policy, and Great American's employee-pay structure in which employees in the claims division received bonuses based upon the performance of their division.

{¶74} Although this is circumstantial evidence of a financial incentive to deny the claim, that does not negate Great American's good-faith handling of the claim. Great American accurately described, in several letters to CyrusOne, the type of proof necessary to demonstrate a covered loss. In addition, it was undisputed that

19

Great American granted several extensions of time for CyrusOne to gather and submit the necessary proof.

{¶75} The two parties disagreed about whether the loss was covered and what proof was required to show a loss. But this is not enough to show a bad-faith denial of the claim. We find that Great American did not act arbitrarily or capriciously in denying coverage. This claim involved a complicated financial scheme and ultimately required expert testimony to demonstrate a loss. Because there was a legitimate dispute as to coverage, Great American processed CyrusOne's claim in good faith.

{¶76} We overrule CyrusOne's first and second assignments of error.

II.      Damage award for commissioning is unsupported

{¶77} In its third assignment of error, CyrusOne contends that the trial court erred by not including in its judgment CyrusOne's loss of at least $1,197,841 caused by fictional commissioning. We are unpersuaded.

{¶78} First, CyrusOne's contention that the court intended to award damages for fictional commissioning is undermined by the trial court's refusal to award an additional amount after CyrusOne asked it to do so when submitting the final judgment entry for signature. The trial court meant to enter the award as it is.

{¶79} Second, CyrusOne's argument that the $1.2 million should have been included in the trial court's award of damages because the commissioning work was fictional also fails. CyrusOne points to Jim Hatem's testimony that although commissioning should take at least a week and requires between 20 and 25 employees, he only observed CMC perform commissioning for two or three days with only four or five employees. However, Hatem admitted that he was only on site for a few construction projects when commissioning was being done. Additionally,

20

McDowell testified that he had seen CMC on site to perform commissioning and said that CMC employees worked some "crazy, long hours."

{¶80} CyrusOne argues that even if commissioning work had been performed, it had no value because it was performed by a nonindependent entity—CMC's owner also owned Cabo Electric, the preferred electrical vendor on CyrusOne projects. Although Hatem testified that commissioning had no value if performed by a nonindependent entity, the trial court was free to disregard this testimony or give it little weight, especially given the undisputed fact that CyrusOne's datacenters, all commissioned by CMC, were in operation with paying customers leasing the equipment. Therefore, the court could have reasonably concluded that CMC's commissioning services did have some value to CyrusOne and that a damage award was not warranted.

{¶81} Although the trial court stated in its decision that CyrusOne's payments for fictional commissioning was "clearly a loss to CyrusOne," this statement was made in the context of the overall kickback scheme and not as a separate finding in support of an additional damage award.

{¶82} An award of $1.2 million in damages for "fictional" commissioning is unwarranted because there was conflicting testimony about whether commissioning work was performed and there was no testimony as to whether CyrusOne had overpaid for any commissioning work. The trial court's choice to reject CyrusOne's request to include these damages was supported by competent, credible evidence.

{¶83} Accordingly, the third assignment of error is overruled.

III. Award for claim expenses was unsupported

{¶84}  In its final assignment of error, CyrusOne argues that the trial court erred by failing to award it $100,000 for claim expenses it had incurred in proving its loss under the policy.

{¶85}  The policy contains an endorsement, which provides coverage for 50 percent of claims expenses up to a limit of $100,000. Under the endorsement, "claims expenses means reasonable expenses incurred by the Insured in establishing the existence and amount of any direct loss."

{¶86}  At trial, Bayley testified that since 2013 (when he was hired by CyrusOne for the arbitration proceeding) he had invoiced CyrusOne $202,719.48 for his services. Although the invoices were submitted into evidence, it is unclear how much time was spent in preparation for litigation (arbitration, depositions, and trial) versus forensic-accounting work to establish the existence and amount of loss. In addition, there was no testimony at trial regarding the breakdown of Bayley's work. As such, there was inadequate evidence presented to support a $100,000 award for reasonable claim expenses. The fourth assignment of error is overruled.

## Conclusion

{¶87}  To find a judgment against the manifest weight of the evidence, this court had to determine that the trial court clearly lost its way and created a manifest miscarriage of justice that required reversal. This is not one of those rare cases warranting a conclusion that the trial court's judgment is contrary to the manifest weight of the evidence. The trial court properly entered judgment for CyrusOne in the amount of $4,564,560. Accordingly, the trial court's judgment is affirmed.

Judgment affirmed.

**ZAYAS, P.J.,** and **BERGERON, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.