[Cite as *Rick & Charles Invests., L.L.C. v. Liberty Mut. Group Inc.*, 2025-Ohio-1035.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| RICK AND CHARLES INVESTMENTS, LLC, | : | APPEAL NO. | C-240456 |
| | | TRIAL NO. | A-2303640 |
| | : | | |
| Plaintiff-Appellant, | : | | |
| vs. | : | *O P I N I O N* | |
| LIBERTY MUTUAL GROUP, INC., | : | | |
| Defendant-Appellee, | : | | |
| and | : | | |
| BERG-BERRY ASSOCIATES, INC., | : | | |
| Defendant. | : | | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: March 26, 2025

*Jones Kahan Law, LLC, Joel Buckley, David M. Jones* and *Michael S. Kahan*, for Plaintiff-Appellant,

*Frost Brown Todd LLP*, *Caitlin E. Vetter* and *William M. Harter*, for Defendant-Appellee.

**CROUSE, Presiding Judge.**

**{¶1}** Plaintiff-appellant Rick and Charles Investments, LLC, ("R&C") appeals from the trial court's entry granting summary judgment to defendant-appellee Ohio Security Insurance Company,[1] ("Ohio Security") on R&C's claims for breach of contract and bad-faith denial of insurance coverage. The trial court granted summary judgment to Ohio Security after determining that a vacancy provision in the insurance policy applied to exclude coverage and that Ohio Security did not act in bad faith because it properly denied coverage. In a single assignment of error, R&C challenges the trial court's grant of summary judgment. For the following reasons, we affirm the trial court's judgment.

## I. Factual and Procedural History

**{¶2}** R&C is owned by brothers Rick and Charles Pescovitz. In October of 2013, R&C purchased a vacant church located at 3215 Woodburn Avenue. Rick contacted Gregg Berry, an agent with defendant Berg-Berry Associates, Inc., ("Berg-Berry") about obtaining insurance on the property. Berry had previously obtained insurance policies for other properties owned by Rick. Rick discussed the intended use of the property with Berry, and he told Berry that he did not intend to personally operate the building as a church. However, Rick indicated that R&C would consider renting out the property to be operated as a church. Rick also told Berry that his potential plans for the property included using it for storage, and using it as a warehouse, a brewery, or an art studio.

**{¶3}** Berry obtained a policy for R&C from Ohio Security. The policy contained both a commercial general liability declarations page and a commercial

---

[1] The answer filed on behalf of Ohio Security Insurance Company explained that it had been improperly named in the complaint as Liberty Mutual Group, Inc.

property declarations page. The commercial property declarations page stated that the property was insured for occupancy under the category of "Churches and Synagogues." The commercial general liability declarations page classified the property under two classification codes, "Churches Or Other Houses Of Worship" and "Buildings Or Premises - Bank Or Office - Mercantile Or Manufacturing (Lessor's Risk Only)."

{¶4} The policy contained multiple endorsements and exclusions related to religious organizations. Included in these provisions were endorsements that insured church members and officers and that provided a property-damage extension for religious organizations. The policy also contained a pastoral-counseling exclusion.

{¶5} A vacancy provision in the policy excluded coverage for vacant property. This provision stated, in relevant part, that a building would be considered vacant unless at least 31 percent of its total square footage is "used by the building owner to conduct customary operations." The provision additionally stated that, where a building has been vacant for more than 60 consecutive days before loss or damage occurs, Ohio Security will not pay for any of the loss or damage if it was caused by vandalism, sprinkler leakage (unless the sprinkler system was protected against freezing), building glass breakage, water damage, theft, and attempted theft.

{¶6} R&C never leased out the property to be operated as a church. Instead, it utilized the property to warehouse materials that Rick used to rehabilitate various other properties that he owned and to store inventory for Under the Weather Tents, a company owned by Rick that manufactured and distributed pop-up tents. The water and electricity to the property were disconnected because, as Rick explained, those utilities were not necessary for use of the building as a warehouse. During R&C's ownership of the property, the roof on the church was replaced, and the gutters, various doors, and a bathroom were repaired. Rick also hired someone to maintain the

yard.

**{¶7}** In September of 2019, R&C discovered that the property had been vandalized, resulting in severe property damage and destruction. R&C submitted a claim to Ohio Security for these damages, but the claim was denied following an investigation by Keith Murray, a field claims representative for the insurance company. The denial was based on the vacancy provision in the insurance policy. The letter denying coverage stated,

> You advised that you purchased the church building 3 or 4 years ago and were looking for a tenant to occupy the building when the loss occurred. In the time you owned the building, you have not had any church tenants. An inspection of the building confirms that the building is vacant and that there have been multiple occurrences of theft, vandalism and water damage over the past months or years. There appears to have been no regular maintenance performed at this location in some time.
>
> . . .
>
> As stated by the policy, a vacant building is not covered for damages caused by theft, vandalism and water damage. This building has not had a tenant for multiple years and as such is vacant and subject to the vacancy provision.

**{¶8}** R&C hired counsel and sent a letter to Murray contesting the denial of coverage. The letter challenged Murray's statements that there had been multiple occurrences of theft, vandalism, and water damage, and that there had been no regular maintenance on the property. The letter also challenged Murray's determination that the property was vacant, asserting that the policy had no requirement that the property

4

be operated as a church and that it had, instead, been used for storage.

{¶9} Ohio Security maintained its denial of coverage, and R&C subsequently filed a complaint against Ohio Security and Berg-Berry in the Hamilton County Court of Common Pleas. The complaint asserted claims for breach of contract and bad faith handling of R&C's claim against Ohio Security, and claims for negligent misrepresentation and professional negligence against Berg-Berry.

{¶10} Ohio Security filed a motion for summary judgment, along with the depositions of Rick Pescovitz, Gregg Berry, and Keith Murray. In support of its argument for summary judgment, Ohio Security relied on language in the policy's declarations pages stating that the property was covered for occupancy as a church or synagogue. It argued that coverage of R&C's claim was properly denied pursuant to the vacancy provision in the policy, because the policy language required that the property be used for the customary operations of a church. It further argued that because the claim was properly denied, there was no breach of contract and Ohio Security did not act in bad faith.

{¶11} R&C filed a memorandum in opposition to Ohio Security's motion for summary judgment. It contended that Rick told Berry that the property might not be actively used as a church and that he was considering several other uses for the property, including use as a warehouse, and it argued that the customary operations of the property were those of a warehouse. R&C asserted that the property was not vacant because at least 31 percent of it was used for the customary operations of warehousing and storage. In support of its argument that the property was not required to be used as a church, R&C directed the trial court to the declarations page of the policy that listed two classification codes, one for "Churches or Other Houses of Worship," and a second for "Buildings Or Premises - Bank Or Office - Mercantile Or

5

Manufacturing (Lessor's Risk Only)." R&C contended that neither Berry nor Murray could explain the purpose of this second classification code or its impact on R&C's claim, and that R&C's continuous use of the property for manufacturing and/or inventory purposes met the usage contemplated by this code.

**{¶12}** With respect to the bad-faith claim, R&C argued that Ohio Security's failure to make a full investigation and to inspect the lower level of the property that was used for warehousing, along with its refusal to reinspect the property, constituted a prima facie case of bad faith.

**{¶13}** Berg-Berry also filed a motion for summary judgment.

**{¶14}** The trial granted summary judgment to both Berg-Berry and Ohio Security. With respect to Ohio Security, it stated,

> The Court finds that the contemplated use of the building is as a church as is expressly stated throughout the Policy, including in the Declarations. The Policy expressly states that it provides coverage for a Church or Synagogue. Ohio Security agreed only to undertake that described risk. It did not agree to insure a vacant building. The Property was not being used for the "customary operations" of a church; it was "vacant" under the terms of the Policy; and the Vacancy Condition applies as a matter of law.

> Regarding the claim that Ohio Security acted in bad faith by not paying the insurance claim, the Court finds that this claim must fail in light of this Court's finding that Ohio Security properly denied coverage of the insurance claim. Its denial of coverage was reasonably justified.

**{¶15}** R&C now appeals, challenging the trial court's grant of summary to Ohio Security, but not Berg-Berry.

6

### II. The Vacancy Provision Excludes Coverage

**{¶16}** In a single assignment of error, R&C argues that the trial court erred when it found that there were no disputed facts and granted Ohio Security's motion for summary judgment.

### A. Standard of Review

**{¶17}** We review a trial court's decision granting or denying a motion for summary judgment de novo. *Smathers v. Glass*, 2022-Ohio-4595, ¶ 30. Summary judgment is appropriately granted where the movant establishes "that (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion when viewing evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party." *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996), citing *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 219 (1994).

### B. Breach-of-Contract Claim

**{¶18}** To succeed on a claim for breach of contract, a plaintiff must establish the contract's existence, performance by the plaintiff, breach by the defendant, and resulting damages suffered by the plaintiff. *White v. Pitman*, 2020-Ohio-3957, ¶ 37 (1st Dist.).

**{¶19}** "'An insurance policy is a contract whose interpretation is a matter of law.'" *Cincinnati Ins. Co. v. CPS Holdings Inc.*, 2007-Ohio-4917, ¶ 7, quoting *Sharonville v. Am. Emps. Ins. Co.*, 2006-Ohio-2180, ¶ 6. Insurance contracts are to be interpreted with the same rules applicable to other written contracts. *Acuity v. Progressive Specialty Ins. Co.*, 2023-Ohio-3780, ¶ 11. As such, courts will "examine the insurance contract as a whole and presume that the intent of the parties is reflected

in the language used in the policy." *Cincinnati Ins.* at ¶ 7. The specific words and phrases in a policy must be accorded their "'natural and commonly accepted meaning.'" *Sauer v. Crews*, 2014-Ohio-3655, ¶ 10, quoting *Gomolka v. State Auto. Mut. Ins. Co.*, 70 Ohio St.2d 166, 167-168 (1982).

{¶20} R&C argues that issues of fact exist as to whether Ohio Security breached the insurance contract by wrongly denying coverage on R&C's claim. Ohio Security, on the other hand, contends that no breach occurred, and that coverage was properly denied based on the vacancy provision in the policy.

{¶21} R&C first argues in support of its assignment of error that certain terms in the vacancy provision, specifically the words "vacancy" and "customary use," are ambiguous and must be resolved in favor of R&C. But R&C never raised an ambiguity argument below and has accordingly waived the right to assert it on appeal. *Jacubenta v. Ranch*, 2013-Ohio-586, ¶ 17 (8th Dist.) (declining to address an argument that an insurance policy was ambiguous because it was being raised for the first time on appeal); *Linder v. Ohio Dept. of Aging*, 2022-Ohio-177, ¶ 15 (1st Dist.) (where a party fails to raise an argument in the trial court, the party waives the right to assert the argument on appeal).

{¶22} R&C argues that, although it did not use the word "ambiguous" when opposing Ohio Security's motion for summary judgment, the policy's ambiguity was the crux of its argument to the trial court. We disagree. R&C's argument to the trial court was that the customary operations of the property were those of a warehouse, which it contended was a permitted use under the second classification code in the policy, "Buildings Or Premises - Bank Or Office - Mercantile Or Manufacturing (Lessor's Risk Only)." R&C argued that Ohio Security could not explain this code and that it created a genuine issue of material fact as to what the customary operations of

8

the property were. This is a different argument than an assertion that the policy is ambiguous.

{¶23} R&C next argues that an issue of fact exists as to what the "customary operations" of the property were, and, consequently, as to whether the vacancy condition applies. It challenges the trial court's determination that the customary operations of the property were those of a church or synagogue, contending that nothing in the policy required the property to be used as a church and that the trial court ignored the second classification code in the policy.

{¶24} As set forth above, the vacancy provision provided that the property will be considered vacant "unless at least 31% of [the property's] total square footage" is being "[u]sed by the building owner *to conduct customary operations*." (Emphasis added.) The term "customary operations" is not defined in the policy. "A court must give undefined words used in an insurance contract their plain and ordinary meaning." *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108 (1995). The word "customary" is defined as "commonly practiced, used, or observed" or "based on or established by custom." *Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/customary (accessed March 19, 2025). In determining the meaning of a word in a contract, "[t]he class and character of the property at issue" is relevant. *Icarus Holdings 2, LLC v. AmGUARD Ins. Co.*, 601 F.Supp.3d 314, 324 (N.D.Ill. 2022).

{¶25} An examination of how other courts have determined what the customary operations were of properties that were subject to similar vacancy provisions is helpful in ascertaining the customary operations of the property in this case.

{¶26} The Eighth District has held that the "'nature and character of the

building, the purpose for which it was designed, and the use contemplated by the parties as expressed in the insurance contract'" must be considered. *Salem v. First Fin. Ins. Co.*, 1998 Ohio App. LEXIS 5576, *9 (8th Dist. Nov. 25, 1998), quoting *Cashen v. Camden Fire Ins. Assn.*, 48 Tenn.App. 470, 473 (1961). It clearly stated that "[t]he 'contemplated use [for a building] is determined by the terms expressed on the contract.'" (Bracketed text in original.) *Id.* at *10, quoting *Cameron v. Frances Slocum Bank & Trust Co.*, 824 F.2d 570, 573, fn. 2 (7th Cir. 1987).

**{¶27}** In *Young v. Linden*, 130 Ohio App.3d 1 (8th Dist. 1998), the court upheld a grant of summary judgment to an insurance company that had denied a claim for coverage based on a vacancy exclusion. The applicable policy described the property at issue as a tavern. But, according to the plaintiff's own admission, the property had not been operated as a tavern for over a year and was "used for nothing other than storage." *Id.* at 7. The court held that, "[b]ecause the evidence showed that the building had been unoccupied for more than 60 days prior to the date of loss, coverage was excluded under the terms of the policy." *Id.* The use of the property for storage, even for items connected to the stated description of the property, was not sufficient to avoid application of the vacancy exclusion.

**{¶28}** *Keren Habinyon Hachudosh D'Rabeinu Yoel of Satmar BP v. Philadelphia Indemn. Ins. Co.*, 2011 U.S. Dist. LEXIS 25172 (E.D.N.Y. Mar. 10, 2011), *aff'd*, 462 Fed.Appx. 70 (2d Cir. 2012), involved an insurance policy with a nearly identical vacancy exclusion. The property at issue was described in the policy as a high school. *Id.* at *2. At some point after the policy was issued, the school was closed and the property was instead used "for the storage of school supplies, furniture, and computers." *Id.* at *3. It was also occasionally used for meetings and training sessions. *Id.* at *4. The property suffered substantial damage, and coverage was sought under

the policy. *Id.* at *6. Coverage was denied based on the vacancy exclusion. *Id.* In finding that the vacancy exclusion applied, the court stated,

> The policy exclusion is unambiguous and was clearly intended to apply to the customary operations of a school. While the policy does not define "customary operations," the parties do not dispute that [the property] was initially insured as a "High School," and at no point, until after the loss, did Plaintiff inform Defendant otherwise. Given the context of the provision, and the reasonable expectation of the parties, customary operations cannot be interpreted as anything other than the customary operations of a school.

*Id.* at *8-9. The court noted that the fact that the building had no electricity further supported application of the vacancy exclusion. *Id.* at *12-13.

{¶29} In *Camelback Properties v. Phoenix Ins. Co.*, 2012 U.S. Dist. LEXIS 1972 (N.D.Ill. Jan 6, 2012), a submitted insurance claim for property damage was denied based on a vacancy exclusion in the applicable policy. The issue before the district court in determining whether the vacancy exclusion applied was whether the "purported use of the building constituted customary business operations." *Id.* at *14. While the second floor of the property was used as an office to conduct business, a portion of the first floor and the basement were used for storage. *Id.* at *8-9. The court stated,

> "Customary business operations" is not defined in the policy, so the court will look to the intent of the policy based on the language of the contract. The declarations page of the insurance policy at issue indicates that the Property was listed as an office for the purpose of occupancy. The context of the insurance contract at the time it was entered into

would have created a reasonable expectation by both parties that building was being insured as an office building, and that Plaintiffs or their lessees would conduct operations customary for an office building.

*Id.* at *14. The court held that use of the second floor of the building as an office constituted customary business operations at the property. *Id.* at *15-16. But it held that the property owner "has not demonstrated for the purpose of a motion for summary judgment that use of the first floor unit for storage of left-over construction and building materials constituted customary business operations under the terms of the insurance policy." *Id.* at *17.

**{¶30}** A review of this case law and the policy at issue leads us to conclude that the parties' contemplated use of the building was for the customary operations of a church or synagogue.

**{¶31}** First, the property itself was indisputably a church. *See Salem*, 1998 Ohio App. LEXIS 5576, at *9, quoting *Cashen*, 48 Tenn.App. at 473 (the "nature and character of the building" are relevant in determining customary operations). Although the property was not used as a church at the time that it was purchased by R&C, it was nonetheless a church.

**{¶32}** Second, the declaration pages of the policy setting forth the summary of property coverages twice stated that the property was to be occupied as a church or synagogue.

**{¶33}** Third, the policy contained endorsements that insured church members and officers and that provided a property-damage extension for religious organizations. The policy also contained a pastoral-counseling exclusion. These endorsements and the exclusion would not have been necessary were the property not intended to be used as a church or synagogue.

12

**{¶34}** Fourth, the dictionary definition of the word "customary," which, as set forth above, is "commonly practiced, used, or observed" or "based on or established by custom," supports a determination that the customary operations of the property were those of a church or synagogue. *See Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/customary (accessed March 19, 2025). This conclusion is consistent with our obligation, when determining the meaning of a word, to consider "[t]he class and character of the property at issue." *See Icarus Holdings* 2, 601 F.Supp.3d at 324. There is little dispute that the "class and character" of the building is that of a church, not a warehouse.

**{¶35}** Contrary to R&C's assertion, the second classification code in the policy, "Buildings Or Premises - Bank Or Office - Mercantile Or Manufacturing (Lessor's Risk Only)," does not create a genuine issue of material fact as to the customary operations of the property.

**{¶36}** As stated above, the policy included a commercial property declarations page and a commercial general liability ("CGL") declarations page. The main difference between a commercial property and a CGL declarations page lies in the type of coverage they detail. Commercial property insurance covers damage to the business's own property, while CGL covers liability for damages or injuries the business causes to others. *See Gap, Inc. v. Fireman's Fund Ins. Co.,* 11 A.D.3d 108, 112 (N.Y.App.Div. 2004), citing Postner and Rubin, *New York Construction Law Manual,* § 10.06, at 380 ("'The principal distinction between liability and property insurance is that liability insurance covers one's liability to *others* for bodily injury or property damage, while property insurance covers damage to one's *own* property.'" (Emphasis sic.)).

**{¶37}** The classification codes, "Churches Or Other Houses Of Worship" and

13

"Buildings Or Premises - Bank Or Office - Mercantile Or Manufacturing (Lessor's Risk Only)," are not found in the "summary of property coverages," but on a page in the policy pertaining to the CGL "summary of classifications." Thus, the classification codes are relevant to a liability claim, not a property claim. R&C's denied claim was a property claim, and the summary of property coverages in the commercial property declarations schedule plainly states that that the property was insured for occupancy under the category of "churches and synagogues."

**{¶38}** R&C's argument that its use of the property as a warehouse fell within this classification code also ignores the phrase "Lessor's Risk Only" in the classification code. Courts have found that the term "Lessor's Risk Only" in insurance policies refers to "a type of insurance that provides coverage for building owners who lease out significant portions of their building." *Suniland Assocs., Ltd. v. Interstate Fire & Cas. Co.*, 2007 U.S. Dist. LEXIS 113429, *11 (S.D.Fla. Oct. 29, 2007); *see Colony Ins. Co. v. 28-41 Steinway, LLC*, 2023 U.S. Dist. LEXIS 11317, *10-11 (E.D.N.Y. Jan. 23, 2023) (holding that "the term 'lessor's risk' in insurance has a specialized meaning that limits insurance coverage to damages sought by property tenants, or at the very least to injuries suffered on the landlord's property"). The inclusion of this language in the policy comports with Rick's testimony that he considered leasing the property for use as a church.

**{¶39}** The record contains no genuine issues of material fact as to the customary operations of the property, which the trial court properly determined were those of a church. And because R&C was not using at least 31 percent of the building to conduct customary operations, the property was vacant. Further supporting a determination that the building was vacant is the fact that the water and electricity to the building had been shut off. *See Keren Habinyon Hachudosh D'Rabeinu Yoel of*

*Satmar BP*, 2011 U.S. Dist. LEXIS 25172, at *12-13.

**{¶40}** Because the property was vacant and had been so for more than 60 consecutive days prior to incurring damage, the vacancy provision in the policy excluded coverage for R&C's claim. Ohio Security did not err in denying coverage based on this provision and did not breach its contract with R&C. We accordingly hold that no error occurred in the trial court's grant of summary judgment to Ohio Security on the claim for breach of contract.

### C. Bad-Faith Claim

**{¶41}** R&C next challenges the trial court's grant of summary judgment to Ohio Security on its claim for bad-faith handling of the insurance claim.

**{¶42}** An insurance company has a duty to act in good faith towards its insured when carrying out its duties. *CyrusOne, L.L.C. v. Great Am. Ins. Co.*, 2021-Ohio-1971, ¶ 71 (1st Dist.). "In Ohio, an insurer fails to exercise good faith when processing an insurance claim when the refusal to pay the claim is not based on any circumstances that reasonably justify the denial." *Walker v. Albers Ins. Agency*, 2019-Ohio-1316, ¶ 23 (1st Dist.). "'An insurer lacks reasonable justification for denying a claim when its refusal to pay is based upon an arbitrary or capricious belief that the insured is not entitled to coverage.'" *Eddy v. Farmers Property Cas. Ins. Co.*, 2024-Ohio-1047, ¶ 20 (1st Dist.), quoting *Drouard v. United Servs. Auto. Assn*, 2007-Ohio-1049, ¶ 17 (6th Dist.).

**{¶43}** R&C argues that Ohio Security's failure to make a full investigation and to inspect the lower level of the property that was used for warehousing, along with its refusal to reinspect the property, constituted bad-faith handling of the claim.

**{¶44}** Rick testified that he was present when Murray investigated the property, and that Murray never looked at the lower level during the inspection. Rick

specifically stated that Murray "didn't go downstairs where the majority of our goods were warehoused. He said he'd seen enough. So by him saying he'd seen enough to me meant, okay, we're good to go."

**{¶45}** Murray, in turn, testified that he was directed by Rick and his contractor during his inspection of the property, and that they did not show him the lower level. When asked why he did not inspect the entire property, he stated, "They pointed out the things that they wanted to show me." Murray explained that his intention was to inspect the damages that were being claimed, and that he did not assume he knew better than the insured and the contractor as to what parts of the building should be examined.

**{¶46}** On this record, we cannot find that Ohio Security lacked a reasonable justification for denying R&C's claim. Murray inspected the property at the direction of the insured and the insured's contractor, and he found it to be in disrepair and lacking electricity and water. The property was indisputably not being used as a church, which the policy provided was its customary operations. While Murray's denial letter incorrectly stated that there had been no regular maintenance on the property, that misstatement did not impact Ohio Security's denial of R&C's claim based on the vacancy exclusion. Because the claim was denied on the basis that it was not being used for the customary operations of a church, it was not unreasonable that Murray did not reinspect the property after R&C contested his denial. A reinspection would not have changed a determination that coverage was not available under the policy.

**{¶47}** Ohio Security's determination that coverage should be denied was based on "circumstances that reasonably justified the denial," namely the condition of the property, including the lack of electricity and water, and the fact that the property

was not being used for its customary operations. *See Walker*, 2019-Ohio-1316, at ¶ 23 (1st Dist.). Murray's belief that coverage was not available was not arbitrary or capricious. *See Eddy*, 2024-Ohio-1047, at ¶ 20 (1st Dist.).

**{¶48}** We accordingly hold that the trial court did not err in granting summary judgment to Ohio Security on R&C's claim for bad-faith handling of the insurance claim. R&C's assignment of error is overruled, and the judgment of the trial court is affirmed.

Judgment affirmed.

**BOCK** and **NESTOR, JJ.,** concur.

Please note

The court has recorded its entry on the date of the release of this opinion.